IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

TOLEDO BLADE NEWSPAPER UNIONS
BLAD PENSION PLAN, et al.,

                              Plaintiff,                    Case No. 3:04 CV 7123

              -vs-                                          MEMORANDUM   OPINION

INVESTMENT PERFORMANCE SERVICES,
LLC, et al.,

                              Defendant.

KATZ, J.

        This matter is before the Court on opposing motions for summary judgment (Doc. 230,

232).  This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I. Background

        Plaintiff The Toledo Blade Newspaper Unions - Blade Pension Plan and Trust ("the Plan")

is an "employee benefit plan" as defined by ERISA.  Plaintiffs Barbara F. Gessel, Donald M.

Brehmer, and Richard O. Gase, were Trustees of the Plan and fiduciaries of the Plan at the time

this action was filed.  Plaintiff David W. Zoll is now and has been since February 1996 an

alternate Trustee for the Plan.  Defendant Investment Performance Services, LLC ("IPS") was

hired as the investment consultant for the Plan in July 1995. The Plan contracted with IPS to

provide investment advisor consulting services to the Plan, including advising the Plaintiff Plan

Trustees with respect to the Plan's investments, investment strategies, and investment managers.

        The written Statement of Investment Objectives of the Plan declares that the primary

investment objective is to preserve the principal of the trust fund.  Ark Ex. 3; Shanklin Depo. at

107-108.  The Investment Objectives state that the investment emphasis shall be placed on consistency of performance to protect the Trust assets from excessive volatility in market value from year to year.  *Id*. at 109-10. This Statement of Investment Objectives was adopted by the Trustees, became effective September 1, 1996 and continued until revised by IPS.  *Id*.

In March-April 2000, Defendants and IPS employees Thomas Shanklin and Gregory Suchocki allegedly advised the Trustees to change the Plan's asset allocations and that the Plan's improved financial health suggested more risk-tolerance.  At the time IPS was initially hired, the Plan had a single investment manager, Weis, Peck & Greer, with a single investment style, growth.  IPS's approach to the Plan was to diversify the portfolio between various capitalization ranges and between growth and value, as well as to add fixed income and real estate.  IPS allegedly recommended that the Plan diversify by adding a value manager, which it did. The Trustees chose two of the three managers that were presented by IPS. Thus, Loomis, Sayles and Lazard Freres were hired to take over some of the funds that had previously been managed by Weiss, Peck & Greer.

Shanklin and Suchocki attended the December 16, 1999 Board meeting of the Plan Trustees. At that meeting Shanklin took the opportunity to raise an issue that had been presented to the Trustees at the previous meeting – to consider further diversification of the portfolio. Shanklin made a recommendation that the Trustees permit him to prepare an analysis, as if deciding what to do with the Plan's entire funds, $112 million, as if starting from scratch. The Trustees agreed to the IPS proposal.

The Plan Trustees met with Shanklin and Suchocki again on March 15, 2000.  At that time Shanklin suggested that the Plan retain an all-cap equity growth manager, as well as an investment

2

manager for all cap equity value, international equity, real estate, and fixed income. IPS also presented an Alternative Asset Allocation that had been prepared on March 14, 2000, the day before the Trustees' meeting.  Pls.' Ex. 32.  This Asset Allocation prepared by IPS shows an allocation of $35,329,000 (30% of the total fund) in an "all-cap" growth equity.  The Plan's investment in equities would be divided among growth, value and international.  The Trustees discussed increasing the equity allocation, and discussed the fact that there was a certain level of risk involved.  Shanklin envisioned that for each of the components in the IPS allocation model, the percentage allocated could be plus or minus five to ten percent at any given point in time.

Shanklin and Suchocki told the Trustees at the March 15, 2000 meeting that Ark Asset Management Co., Inc. and Delaware Investment Advisors should be considered as candidates to manage the all-cap growth equity portion of the fund.  The Trustees requested that IPS prepare a search report for each asset class, showing manager candidates to be reviewed and discussed at the next meeting, rather than the Trustees conducting a series of interviews.

When IPS conducted a manager search for a client, the IPS investment consultant was the one who ultimately selected the subgroup of managers to be put before trustees. Shanklin Depo. at 177.  Shanklin sent an e-mail to the IPS Search Department on the day following the March meeting, informing that department of the dollar amount of each asset allocation category and stating that the scope of the search for all-cap growth would be Ark, Delaware, and a third manager, Essex.  The IPS Search Department was to prepare a report with information about these investment managers which Shanklin and Suchocki would present to the Trustees.  Shanklin and Suchocki were to summarize this information in a presentation to the Trustees, with Suchocki

3

making a recommendation to the Board as to the hiring of a specific manager for each asset category, including all-cap growth.[1]

IPS prepared an Investment Manager Review report that was provided to the Trustees at their meeting on April 20, 2000. The Investment Manager Review report was signed by Shanklin and Suchocki. Ark and Delaware were still the only two potential investment manager candidates recommended by IPS for the all-cap growth portion of the Plan's portfolio.  Def. Ex. 15.  IPS represented that it had carefully selected these candidates for presentation to the Board and that the Plan could comfortably hire either one. Shanklin Depo. at 341-42; IPS Exhibit 15. IPS further represented that either of these two managers would meet the special needs of the Plan and would preserve capital in the fund with low risk.  IPS understood that the benchmarks listed on the Investment Manager Review report for the candidates applied to the benchmark for both performance and volatility.  Shanklin Depo. at 377. Shanklin presented the product information for Ark and Delaware to the Board, in lieu of presentations from either of the investment managers.  The Manager Review reported that, in the most recent calendar quarter, the Specialty

---

[1]

Plaintiffs describe the IPS search process, after discovery, as follows:

> IPS maintained a database of varying types of investment managers to provide manager recommendations when manager searches were requested. [Shanklin Depo. at 41.]  IPS represented to the Trustees that the manager search process would include 4,000 portfolio managers. [Shanklin Depo. at 60-61.] However, IPS did not closely follow all of these managers from their database. IPS had historically chosen 10 or 20 managers in certain asset categories to follow. [Shanklin Depo. at 239.] These were the managers included on a Search List of IPS-approved managers that IPS historically selected to present to their clients for consideration. [Shanklin Depo. at 223.] In regard to an all-cap growth investment manager, there were actually only three candidates in the entire IPS "universe". [Shanklin Depo. at 327, Pls. Ex. 43.]

Doc. 232 at 6-7.

Growth portfolio had a return of 52.7%, and in the prior year it had a return of 96.6%. In comparison, the Manager Review showed that two comparative indices, the Wilshire All Growth Index and the S&P 500 Growth Index, had significantly lower returns, 27.2% and 19.7% during the prior quarter, and 36.6% and 28.3% during the prior year, respectively.

The Manager Review also disclosed that the Specialty Growth portfolio had significant volatility. The "risk" (i.e., volatility) of the Specialty Growth portfolio returns as shown in the Manager Review was 38.1% for the prior three years (compared with 22.9% and 19.6%, respectively, for the two comparative indices), and 30.7% for the prior five years (compared with 17.7% and 15.3%, respectively, for the two comparative indices).  The Manager Review further disclosed that the Specialty Growth portfolio's "beta" for the eight previous quarters (1998 through 1999) ranged from 1.1 to as high as 1.6.  "Beta" is a measure of risk and volatility in comparison with the S&P 500.

After examining the Manager Review, the Trustees discussed allocations and the extent to which the Plan should increase its equity exposure.  The Trustees decided to allocate 70% of the Plan's assets to equity (30% growth, 25% value, 15% international), to terminate Lazard Frères and Weiss, Peck & Greer, and to retain new investment managers, including Ark as growth investment manager.

In the end, Ark's product would prove to have far greater volatility and far greater risks than was acceptable under the Plan's guidelines.  However, a comparison of the data presented to the Trustees for both Ark and Delaware shows that even Delaware's risk was similar to Ark's volatility for the time periods reported. Defs. Ex. 15 at 00095-96.  The Trustees maintain that they were not made aware of the significance of any statistical information as to volatility from

5

anything presented to them by IPS.  *See* Gessel Depo. at 71-75.  The Trustees chose Ark over Delaware and allocated the suggested percentage of Plan assets, 30% - $35 million - to Ark's Specialty Growth Product.  Ark was engaged as the sole equity growth manager.

On May 31, 2000, the Plan and Ark entered into an Investment Management Agreement. On November 6, 2000, Ark accepted an Addendum to the Plan's Investment Policy Statement, which listed as benchmarks for Ark as growth manager the Wilshire 5000, Russell 3000, Wilshire 5000 Growth, and Russell 3000 Growth indices.

At a later meeting, on June 22, 2000, the Trustees adopted a revised Investment Policy Statement dated June 2000, which stated, in relevant part, that "[a]ppropriate performance benchmarks for [i]nvestment [m]anagers will be defined in individual addendums" and that "[a]s a general investment guideline, the volatility of a portfolio's returns will be targeted to the volatility of the benchmark index as listed in each manager's addendum."  At their meeting on August 24, 2000, the Trustees reviewed an Investment Performance Analysis for the quarter ending June 30, 2000, prepared by IPS, which showed that the Specialty Growth portfolio "beta" was 1.41.[2]

---

[2] Another issue which was brought by IPS before the Trustees on August 24, 2000 concerned the allowable percentage of stock ownership in any one security. Ark had asked that the investment guidelines be modified to allow it to hold 10% of stock at market, instead of the 5% at market, as stated in the new investment policy guidelines prepared by IPS in June 2000.  This suggested change was identical to a provision that had been present in the Plan's previous investment policy, but had been changed by IPS when it drafted the new policy in June 2000. Ark's requested modification was approved by the Trustees on October 26, 2000. A revision to the still unexecuted Investment Policy Addendum that had been sent to Ark in June 2000, was drafted by Plan counsel reflecting this 5% to 10% change. This revised Addendum, incorporating the increased permissible percentage of stock, still listed the four different indices as benchmarks; the Russell 3000, Wilshire 5000 and Wilshire 5000 Growth and the Russell 3000 Growth.  These provisions stated they were for all investments starting with October 26, 2000. This Addendum still included the provision that the volatility of the portfolio's return was to be targeted to be equal to or less than the volatility of the benchmark index.  London Depo. at 63.

(continued...)

6

During the Trustees' meeting on December 14, 2000, Ark employees reviewed Ark's performance by conference call.  The Trustees were informed that the Ark Specialty Growth portfolio was an aggressive all-cap growth product, which they understood would connote a more risky growth stock.

At the meeting of the Trustees on March 1, 2001, IPS distributed and reviewed its Investment Performance Analysis dated December 31, 2000,  which reported that the Ark Specialty Growth portfolio had incurred a 31.46% loss during the fourth quarter of 2000 compared with a 21.27% loss for the Russell 3000 Growth Index.  Suchocki of IPS also informed the Trustees that the Plan had lost 8.8% in the fourth quarter and 3.2% for the year, based largely on Ark's 31.5% loss in the fourth quarter, and that the first quarter of 2001 would likely be as bad or worse than the fourth quarter of 2000, with growth manager Ark potentially down 50% from the third quarter of 2000.

Subsequently, in a letter to IPS dated July 31, 2001, sent in response to IPS' quarterly request for confirmation of compliance with the Plan's Investment Policy Statement, Ark stated:

> [T]he Specialty Growth Portfolio is and always has been a concentrated portfolio, the investment style of which prevents Ark from targeting the volatility of the portfolio's returns to that of a benchmark consisting of over 1,000 securities. As previously discussed, given the Specialty Growth investment style, the Standards of Performance relating to the volatility of quarterly returns included in the Investment Policy Statement dated June 2000, as well as the Addendum thereto ... do not apply to the Specialty Growth style.

The Plans' Investment Policy Statement sets standards for the fund overall, and each investment manager has a separate addendum that addresses specific guidelines for that manager.

---

[2](...continued)
It was signed by Ark on November 6, 2000. Pls.' Ex. 20.

7

IPS was responsible for and did draft the Investment Policy Statement as well as the addendums for the consideration of the Plan's attorney and the Trustees.  IPS also made the determination as to which index or indices were used as benchmarks for each equity manager and these were made a part of each addendum.

Shanklin believed that it was possible to benchmark volatility to four different indices, but that it would be difficult to target volatility to four different indices at the same time.  Shanklin Depo. at 408-09, 469.  Plaintiffs have presented testimony of investment professionals who have concluded that this is impossible. *See* Higgins Depo. at 32-33; Mermelstein Depo. at 26; Stip. at ¶1.

Plaintiffs allege that the Trustees were informed by IPS at their February 7, 2002 meeting that there was a typographical error in Ark's previous investment guidelines. The Trustees were told that because the Specialty Growth product allowed the investment manager to invest in small, medium, and large-cap stocks, reference in the initial addendum should have been to the Russell 3000 Growth, not the Russell 2000 Growth Index as a benchmark.  Norton Depo. at 215-17, 429; Ark Ex. 58.

Plaintiffs allege that Ark had not suggested that the reference to the Russell 2000 Growth Index was a typographical error.  Norton testified that Ark received the new investment policy guidelines at the end of June 2000 with four benchmarks. The market support group called this to Norton's attention while they were compiling one of the periodic reports for the Plan. It was this inquiry that prompted Norton to call Suchocki to discuss the four benchmarks. This conversation between Norton and Suchocki led to the decision between IPS and Ark to use the Russell 3000 Growth Index as the most appropriate benchmark comparison with IPS, with IPS allegedly later

8

relating to the Trustees that the Russell 2000 Growth Index was included as a minor typing error. *See* Norton Depo. at 352-353.

IPS was later told by Ark that it was impossible to target the volatility of the product to any specific benchmark. This information was related to IPS from Ark's investment team after Ark reviewed the four benchmarks in the new Addendum. Norton Depo. at 215-17, 429.  In fact, as it turned out, the Ark Specialty Growth product was managed in such a way that it could not target any benchmark despite the fact that Ark initially agreed that its performance would be measured against the Russell 2000 Growth index and then later agreed to target the volatility of its product against four separate indices (the Russell 3000, the Wilshire 5000, Russell 3000 Growth and the Wilshire 5000 Growth).  Defs. Ex. 17, 20.  Norton testified that on deposition several other conversations were held between Norton and Suchocki over a period of time between January and July 2001 regarding Ark's inability to target the volatility of the product to a specific index. Norton Depo. at 365-68.

Ark provided quarterly compliance reports to IPS.  Laurie London completed and submitted a quarterly compliance report, dated August 15, 2000, covering the second quarter of 2000 and stating that Ark was in compliance with the fund's investment policy. London Depo. at 50-52, Pls' Ex. 10 at ARK 000334.  Similar representations were made for the remaining quarters of 2000 by Ark through London on November 7, 2000 and January 17, 2001.  London Depo. at 52-56, Pls' Ex. 13, 14.

The investment pension funds managed by Ark substantially decreased, losing over half their value by the end of the first quarter of 2001.  Ark did not issue its quarterly compliance report during the first quarter of 2001.  Due to the continuing poor performance of the

assets under Ark's management, the Trustees allegedly questioned whether Ark's volatility was appropriately targeted to its benchmark indices, and allegedly were told by Suchocki of IPS that "a representative from Ark told him that volatility issues relative to any benchmark were not considered when making individual stock selections." Compl. at ¶ 29. After being contacted by IPS, Ark responded by letter on July 31, 2001, indicating that it could not possibly comply with the volatility requirements of its benchmark index, due to Ark's investment style for this growth product. The Trustees and IPS discussed the letter at the August 23, 2001 Trustees meeting.

IPS also discussed Ark's violation and the high volatility risk of the Ark product with the Plan at the Trustees' Meeting on November 7, 2001. The Plan rejected Ark's invitation to amend the Addendum to the Investment Policy Statement to reflect a new and different definition of volatility for the Specialty Growth product. Norton Depo. at 455-58, Ark Ex. 54. The Trustees recognized that Ark's all-cap growth investment strategy violated the Plan's stated investment objectives. They terminated the investment consulting contract with IPS and hired a new consultant, beginning the process of finding a suitable investment manager for the funds currently managed in the Ark Specialty Growth product. Ark's services were terminated by the Trustees on September 11, 2003. The funds under Ark's management in the Specialty Growth Product shrank from the original investment of $35,000,000 to $12,011,672 when the funds were removed from Ark. Plaintiffs commenced this action on March 12, 2004. On September 9, 2007, Defendants (Doc. 230) and Plaintiffs (Doc. 232) moved for summary judgment.

## II. Summary Judgment

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no

genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting FED. R. CIV. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; see also *Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822

F.2d 1432, 1435 (6th Cir. 1987)).  However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999).  Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; see also *Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

**III. Discussion**

Defendants argue in their motion for summary judgment that Plaintiffs were aware of the facts indicating the financial ruin of the Plan investments in question prior to three years before the filing of this action, thereby placing Plaintiffs' claim outside the applicable statute of limitations.  Defendants also argue that they are not "fiduciaries" and therefore not liable to Plaintiffs.  Plaintiffs argue that Defendants are liable both as fiduciaries that breached their fiduciary duty to the Plan participants, and as co-fiduciaries of Ark.  Defendants argue, and Plaintiffs dispute, that summary judgment is precluded because genuine issues of material fact exist with regard to the Ark benchmark, the decision to hire Ark, and knowledge of the volatility of the investments.  Defendants also argue that Plaintiffs fail to support a claim for breach of fiduciary duty outright.  Plaintiffs argue in the alternative that Defendants were at least negligent in their misrepresentation of financial advice.

### A. Were Defendants fiduciaries?

"[T]he definition of a fiduciary under ERISA is a functional one, is intended to be broader than the common law definition, and does not turn on formal designations such as who is the trustee." *Smith v. Provident Bank*, 170 F.3d 609, 613 (6th Cir. 1999). Under ERISA, fiduciary status is keyed to discretionary authority over a plan, its investments, or its administration, or to the provision of "investment advice":

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). Moreover, since a person is a fiduciary "to the extent" that he or she does the enumerated actions, the same person may be a "fiduciary" in some but not all of his activities. *Landry v. Air Line Pilots Ass'n Int'l AFL-CIO*, 901 F.2d 404, 417-18 (5th Cir. 1990).

The Department of Labor's regulations explain what it means to provide "investment advice":

> A person shall be deemed to be rendering "investment advice" to an employee benefit plan, within the meaning of section 3(21)(A)(ii) of the Employee Retirement Income Security Act of 1974 (the Act) and this paragraph, only if:
>
> > (i) Such person renders advice to the plan as to the value of securities or other property, or makes recommendation as to the advisability of investing in,   purchasing, or selling securities or other property; and
> >
> > (ii) Such person either directly or indirectly (e.g., through or together with any affiliate)--
> >
> > > (A) Has discretionary authority or control, whether or not pursuant to agreement, arrangement or understanding, with respect to purchasing or selling securities or other property for the plan; or

13

(B) Renders any advice described in paragraph (c)(1)(I) of this section on a regular basis to the plan pursuant to a mutual agreement, arrangement or understanding, written or otherwise, between such person and the plan or a fiduciary with respect to the plan, that such services will serve as a primary basis for investment decisions with respect to plan assets, and that such person will render individualized investment advice to the plan based on the particular needs of the plan regarding such matters as, among other things, investment policies or strategy, overall portfolio composition, or diversification of plan investments.

29 C.F.R. § 2510.3-21.

While, as Defendants note, federal courts hold that the officers and employees of a corporate fiduciary do not automatically acquire ERISA fiduciary status by virtue of their positions, courts also have held that an officer or employee may be an ERISA fiduciary, depending on the extent of responsibility and control the individual exercises. *See Smith v. Provident Bank*, 170 F.3d 609, 613 (6th Cir. 1999) (holding that to the extent the corporate fiduciary delegated duties and powers to its employee and another entity, the employee and entity "personally could become ERISA fiduciaries and be liable . . ."); *Confer v. Custom Eng'g Co.*, 952 F.2d 34, 35 (3d Cir. 1991) (holding that officers who exercise discretion on behalf of a corporate fiduciary are not themselves fiduciaries under ERISA § 3(21)(A)(iii) unless they have "individual discretionary roles as to plan administration," as, for example, where "the corporation delegates some of its fiduciary responsibilities to an officer"); *Bell v. Executive Comm. of the United Food & Commercial Workers Pension Plan for Employees*, 191 F. Supp. 2d 10, 15 (D.D.C. 2002) ("[T]here is no per se rule against holding an individual employed by the corporate fiduciary as an ERISA fiduciary, but rather it is a factual determination involving an assessment of the extent of responsibility and control exercised by the individual with respect to the Plan.").

14

Defendants argue that Shanklin and Suchocki did not: exercise discretionary authority or control with respect to management of the Plan or the disposition of Plan assets; advise the Plan as to the value or advisability of purchasing or selling any securities; have discretionary authority with regard to the purchase or sale of securities; provide investment advice on a regular basis pursuant to an agreement to serve as the primary basis for the Trustees' Plan investment decisions; or render advice on a regular basis under a mutual understanding that the advice would be a primary basis for investment decisions and that Defendants would render individualized investment advice to the Plan based on its particular needs (such as investment policies or strategies, overall portfolio composition, or diversification).

As described in the background above, Shanklin and Suchocki played an active role in, and were contractually compensated for, the provision of investment advice and manager search services.  IPS provided investment advice services to the Trustees under contract beginning in 1995, when Shanklin initially presented IPS to the Trustees.  The contractual account continued and IPS's account for Plaintiffs was transferred to Suchocki in 2000.  Shanklin and Suchocki each attended several Trustees meetings, providing advice on fund allocation and investment manager hiring – key events to the facts underlying this litigation.  Clearly, the Trustees paid for and looked to IPS for investment expertise as to the Plan and its assets, and IPS, Shanklin, and Suchocki fulfilled that role.

Plaintiffs do not move for summary judgment against Defendant David Sloan, but Sloan has moved for summary judgment on the basis that he is not a fiduciary.  Sloan played a small role in the underlying events of this case, and Plaintiffs have not objected to his status as a non-fiduciary.  Summary judgment will be granted to Sloan on that basis.

15

**B. Did Defendants breach their fiduciary duty?**

ERISA provides for a prudent person standard with regard to the execution of fiduciary duties by a plan's fiduciary.

> (1) Subject to sections 1103(c) and (d), 1342, and 1344 of this title, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
> > (A) for the exclusive purpose of:
> > > (i) providing benefits to participants and their beneficiaries; and
> > > (ii) defraying reasonable expenses of administering the plan;
> > (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
> > (C) by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
> > (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.
> (2) In the case of an eligible individual account plan (as defined in section 1107(d)(3) of this title), the diversification requirement of paragraph (1)(C) and the prudence requirement (only to the extent that it requires diversification) of paragraph (1)(B) is not violated by acquisition or holding of qualifying employer real property or qualifying employer securities (as defined in section 1107(d)(4) and (5) of this title).

29 U.S.C. § 1104(a).

Plaintiffs premise their claim for breach of fiduciary duty on the allegation that IPS's actions were imprudent and overly risky when IPS recommended Ark's Specialty Growth product and when IPS failed to disclose to Plaintiffs that the investment could not be tied to the benchmarks which IPS used despite knowledge of their deficiency. Defendants argue, and Plaintiffs dispute, that summary judgment is precluded because genuine issues of material fact exist with regard to the Ark benchmark, the decision to hire Ark, and knowledge of the volatility of the investments.

16

### 1. The Ark contract

Defendants argue that genuine issues of material fact exist regarding who drafted the Ark contract containing the Russell 2000 benchmark, who selected the Russell 3000 benchmark, who suggested that the reference to the Russell 3000 was a typographical error, and when IPS became aware that Ark was not in compliance with its benchmark.

### a. Who drafted the agreement

Plaintiffs agree that IPS did not draft the original Ark management contract. However, the Plaintiffs allege that IPS drafted the Investment Policy Statement and addendums that were presented to the Trustees on June 22, 2000. In those documents, the four benchmarks listed did not include the Russell 2000 Growth index. Defendants have not shown there to be a genuine issue of material fact as to who drafted those documents.

### b. Who selected the Russell 3000 Growth index

Defendants point to the minutes of the April 26, 2001 Trustees meeting, which indicate that Ark selected the Russell 3000 Growth index as a benchmark. Defs. Ex. 31. Defendants also point to a letter from Plaintiffs' counsel indicating the same. Defs. Ex. 32. Plaintiffs, however, argue that the assertion contained in those documents is false. The fact is, they argue, that it was IPS that drafted the addendums with the benchmarks, not Ark, and that it was those addenda which contained the benchmarks, including the Russell 3000 Growth index. The Court agrees with Plaintiffs. Defendants do not dispute that IPS drafted the addenda containing the benchmark indices, and do not propose an explanation as to how IPS drafted the addenda but Ark selected the indices. Defendants' reliance on two mistaken documents does not raise any issue of fact to the level of "genuine."

17

### c. Who suggested that Russell 2000 Growth was a typo

Defendants argue that "Plaintiffs seem to imply that IPS suggested the reference to the Russell 2000 Growth Index was not a typographical error by stating that Ark did not make that suggestion."  Doc. 248 at 10.  Defendants cite deposition testimony of Vivian Folk, who stated that "IPS advised that he had spoken with Robert Norton [who] indicated that reference to the Russell 2000 [G]rowth was a typographical error."  *Id.* (*citing* Folk Depo., Def.'s Ex. 33). Plaintiffs do not dispute that IPS told the Trustees that Ark had suggested that the reference to the Russell 2000 Growth index was a typo.  However, Plaintiffs dispute the underlying veracity of who actually made the suggestion.  Ark maintained that the reason the Russell 3000 Growth index was included was not in error, but rather that Ark believed it to be the more appropriate index for the Specialty Growth investment than the Russell 2000 Growth.  Norton Depo. at 215-17.

Even if it were IPS who first suggested that the inclusion of the Russell 3000 Growth index was a typographical error, it does not explain why IPS never informed the Trustees that it would be impossible for Ark to perform in compliance with the addendum which IPS had drafted using four indices.  As Plaintiffs note, between IPS and the Plan, it was the duty of IPS to have possessed the expertise to know that the investment could not comply with the selected benchmarks.  The information that came from Ark was processed and conveyed to the Trustees by IPS.

### d. When IPS became aware of Ark's non-compliance

In June, September, and December of 2000, Ark completed Quarterly Compliance Checklists which indicated that Ark was in compliance with the fund's investment policy.  Ark did not complete a Checklist in March 2001, which IPS reported to the Trustees.  In July 2001, Ark

sent IPS a Checklist indicating that the benchmarks did not apply to the Specialty Growth style; in other words that the volatility of the investments could not be measured against the benchmarks.

However, Norton of Ark testified that he discussed with Suchocki that the four benchmarks did not make sense between June and November of 2000.  Norton Depo. at 352-53. Norton testified that he told Suchocki that the investment should be measured against the Russell 3000 Growth index rather than four separate indices.  *Id.*  However, the four indices continued to be listed by Ark and reported by IPS as applicable benchmarks.  At least by January 2001, Ark was telling IPS that it could not comply with the benchmarks in the contract.  Stipulation of Undisputed Facts, Doc. 231-3 at ¶ 3, 5. Norton testified to further telling Suchocki that the benchmarks were not appropriate targets for the investment's volatility.  Norton Depo. at 365-69.

IPS claims that it was not aware of the deficiency until the July 2001 Checklist, which it reported to the Trustees.  That assertion alone, however, cannot overcome the evidentiary support that Plaintiffs have produced in support of their claim that IPS became aware of the impossibility that Ark could target the volatility of the funds to the selected benchmarks well before relating such information to the Trustees.

### 2. Hiring Ark

Defendants argue that genuine issues of material fact exist with regard to why only two investment managers were presented to the Trustees and who made the decision to hire Ark.

#### a. Why two managers were proposed

Defendants argue that it was not entirely IPS that decided to present a limited number of possible managers for the investments at issue, but rather that IPS was instructed to search for and select a small number of managers for the Trustees to consider.  Plaintiffs do not necessarily

19

dispute that assertion, but it is ultimately an immaterial distinction. The number of proposed managers is only relevant to Plaintiff's claim insofar as the only two that were proposed – Ark and Delaware – were comparable and presented very similar opportunities. They were both managers with all-cap growth strategies (a limitation imposed by Defendants, not Plaintiffs) who presented similar investment products with few differences in the historical statistical information for each. They also both resulted from the same search process run by IPS, and were both recommended to the Trustees by IPS. Plaintiffs' breach of fiduciary duty claim is not premised on how many options were presented, but that the options presented, specifically the manager who was hired (Ark), presented a failure of an investment strategy, with which IPS went along and which cost the Plan millions of dollars.

### b. Who hired Ark

Defendants note that it was not they who made the decision to hire Ark; they recommended Ark and Delaware to the Trustees, and the Trustees made the decision to hire Ark. Plaintiffs do not dispute that characterization of the process. What is relevant to their claim, however, is that IPS recommended Ark and certified that a search process was conducted with due diligence, and that confidence should accompany the hiring of either Ark or Delaware. The Trustees relied on IPS's recommendation of Ark (just as they could have relied on the recommendation of Delaware) in deciding to hire Ark – a manager found, recommended, and vouched for by the fiduciary Defendants.

### 3. Volatility of the investment

While Plaintiffs claim that Defendants breached their fiduciary duty by advising and allowing the investment of 30% of the portfolio in the Specialty Growth Product, Defendants

argue that they clearly demonstrated to the Trustees the volatile nature of the Product. Defendants' fiduciary duty was to "diversify[] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so . . . ." 29 U.S.C. § 1104(a)(1)(C).

Defendants present deposition testimony that certain Trustees understood volatility and beta value. First, some of the deponents' cited responses reflected their understanding at the time of deposition, not at the time that IPS presented Ark and advised investment in the Specialty Growth product. *See* Zoll Depo. at 168-69. Zoll testified that he understood the Specialty Growth product was riskier than the Wilshire All-Growth, and that a higher beta meant a higher risk, but IPS has provided no evidence that the extent of Ark's risk was actually discussed with the Trustees. All the depositions really reflect is that Trustees had the basic understanding that the higher a risk in an investment, the higher the potential reward or loss – not that they were made aware of the actual extent of the risk of Ark's product. *See* Deposition Excerpts, Def.'s Ex. 45-55. Second, if anything, Defendants' position that Plaintiffs understood the high volatility is actually an admission that high volatility existed. Yet, in spite of their duty to diversify to minimize the risk of large losses, Defendants admit to recommending Ark (albeit along with Delaware) and its Specialty Growth product, which was apparently highly volatile. If, as Defendants allege, the Trustees should have or did know about the high risk, then Defendants breached their fiduciary duty either by allowing the large investment in Ark in light of the high volatility or by being completely ignorant of the high risk even though non-experts were aware of it. Finally, there is no reason to think IPS's advice under these circumstances was clearly prudent in spite of the high

risk.  The Trustees relied on IPS for its expertise and recommendations, and IPS may not here

avoid the fiduciary duties that accompanied its responsibilities.

### C. Were Plaintiffs aware of sufficient facts indicating losses at least three years prior to filing suit?

ERISA contains a scaled statute of limitations on actions with respect to a breach of

fiduciary duty, depending on certain aspects of a claim, as follows:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of--
>
>> (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
>>
>> (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;
>
> except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113.  Defendants allege that the Trustees had actual knowledge of the facts that

constituted the alleged ERISA violation by, at the latest, March 1, 2001, more than three years

prior to the filing of this action, pursuant to 29 U.S.C. § 1113 (2).

The Sixth Circuit construed the "actual knowledge" sufficient to trigger the ERISA

three-year statute of limitations in *Wright v. Heyne*, 349 F.3d 321 (6th Cir. 2003), holding:

> that the relevant knowledge required to trigger the statute of limitations under 29 U.S.C. § 1113(2) is knowledge of the facts or transaction that constituted the alleged violation; it is not necessary that the plaintiff also have actual knowledge that the facts establish a cognizable legal claim under ERISA in order to trigger the running of the statute.
> ...
> [W]e hold that to trigger the running of the statute of limitations under Section 413(2) of ERISA, 29 U.S.C. § 1113(2), it is only the plaintiff's actual knowledge of

22

the underlying conduct giving rise to the alleged violation that is required, rather
than the knowledge that the underlying conduct violates ERISA.

*Id.* at 330-31.

In *Wright*, supra, the plaintiffs had "actual knowledge" of the material facts underlying
their claims (and thus fell within the three-year limitations period) when they actually knew that
the fund managers allegedly: invested funds in high-risk investments, including junk bonds; made
imprudent investment decisions such as annuitizing an annuity, investing in limited partnerships,
and purchasing both A and B shares of the same investment fund; caused the plan to invest in
companies in which the managers had a direct financial interest; caused the plan to purchase or
sell assets "principally for the purpose of earning transaction commissions for themselves"; and
"paid themselves commissions on certain securities transactions in which they engaged on behalf
of the [plan]."  *Wright*, 349 F.3d at 331.  The court also noted that the plaintiffs were told on
multiple occasions that the manager had invested the plan's funds in a manner against which the
plaintiffs had specifically instructed.  *Id.*  Prior to three years before filing their action, the
plaintiffs had met with four groups of investment professionals who "specifically and
unequivocally informed [the p]laintiffs of the 'harmful consequences' of [the investment
managers'] allegedly improper acts and at least one [consultant] advised that [the plaintiffs]
should 'seek legal action.'"  *Id*. at 332.  The plaintiffs had even terminated their relationship with
the defendant managers prior to three years before filing suit, on the basis of those allegedly
improper breaches of fiduciary duty.  *Id*.

In *Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516, 520 (6th Cir. 2008), the plaintiffs'
complaint was silent as to when knowledge of certain facts was acquired, but the court inferred
that, prior to three years before filing suit, the plaintiffs

23

> knew what representations had been made to them by Lucent officials, on which they allegedly relied in deciding to retire early; knew the offering of enhanced benefits in the 2001 [Voluntary Retirement Program] was inconsistent with the representations; and knew, in retrospect, that they had been misled by these representations into believing that something that did come to pass would not.  It thus *appears* from the face of the complaint that plaintiffs had actual knowledge of the facts of transaction comprising the wrong complained of . . .

*Id.* (emphasis in original).  However, the court went on to affirm the district court's dismissal based more heavily on the "incompleteness of the allegations, combined with [the] plaintiffs' resolute and continued silence in the face of the motion to dismiss," which the plaintiffs allowed to sit unamended for two years.  *Id*. at 522.

In *Zirnhelt v. Michigan Consol. Gas Co.*, 526 F.3d 282, 289 (6th Cir. 2008), the court affirmed dismissal of the plaintiff's claims, holding that "actual knowledge" existed when the plaintiff was aware that "the company had failed to provide her with certain documents during her employment, and she was aware that the company had allegedly misinformed her about the plan's vesting requirements during her employment."  *Id*.

Here, the IPS Defendants claim that the Trustees were aware of the facts giving rise to the underlying claim of breach of fiduciary duty by March 1, 2001, three years and eleven days before this action was commenced on March 12, 2004.  Plaintiffs claim that they did not have knowledge of the underlying facts until August 1, 2001, less than three years before the filing of this action. Defendants allege that the Trustees were aware of the volatility and beta value of the Specialty Growth product when, at the Trustees' December 14, 2000 meeting, Ark employees informed the Trustees that the product was a concentrated portfolio of 30-45 companies with expected returns of at least 50%, and that the Ark Specialty Growth product was a more risky all-growth investment.  Defendants also point out that in January 2001 the Trustees were aware that Ark was

24

out of compliance with the benchmarks, but the Trustees did not fire Ark, choosing instead to keep Ark as manager and give Ark an opportunity to correct its losses by reference to new benchmarks. At the March 1, 2001 meeting, IPS presented an analysis that showed a 31.46% (or approximately $10 million) loss in the Ark Specialty Growth product, compared to a 21.27% loss for the Russell 3000 Growth Index. It was not until July 31, 2001 that Ark first stated in a quarterly compliance letter that Ark could not target the volatility of the Specialty Growth product to a benchmark consisting of over 1,000 securities. No prior quarterly letters had indicated that the benchmarks could not be targeted. At the August 23, 2001 Trustees meeting, the Trustees read the July 31, 2001 report, and claim that at that point they became aware of IPS's breach.

There is a difference here between when Plaintiffs became aware of the actions underlying Ark's alleged breach, and when Plaintiffs became aware of the facts underlying IPS's alleged breach. Ark's breach is premised on the giant losses of its product and its inability to match benchmarks that it chose to target. The breach claim against IPS is premised, at least in part, on actions it took to misrepresent Ark's breach. Again, as noted above, Ark's Norton testified that he had numerous conversations with Suchocki between January and July of 2001, telling IPS that Ark simply could not target the Specialty Growth product to a specific benchmark. Norton Depo. at 365-66. Norton considered that conclusion to be obvious on the face of the data, but apparently IPS did not see it that way, because that is not how IPS reported it to the Trustees. It may be that IPS reported to the Trustees that the investment was risky, that the investment had fallen short of benchmarks, $10 million has been lost, and even that Ark's product was not compliant with any of the benchmarks. However, that information which was being relayed from IPS to Plaintiffs was not exactly the information being relayed from Ark to IPS. The crucial difference was what IPS

25

was not saying, but which it knew: that the investment could not possibly be targeted to *any* of the selected benchmarks. As late as March 2001, IPS presented the Trustees with information comparing the Specialty Growth product's performance to the Russell 3000 Growth Index. Before and during that period, Ark informed IPS that the product could not, in fact, be targeted to any of the benchmarks, including the Russell 3000 Growth. It was not until the July 31, 2001 letter that the Trustees learned what Ark was telling IPS but IPS was not telling the Trustees: the benchmark system was flawed in the most basic way.

The amount of knowledge, even to the extent fully alleged by Defendants, falls far short of the information known by the plaintiffs in *Wright*, supra. This case is also different from *Bishop* and *Zirnhelt* in that the very premise of the information being provided by IPS was faulty, and the Trustees had no way of knowing that IPS was misrepresenting information until they received a letter containing that information from Ark. *See* 29 U.S.C. § 1113 (recognizing a six year limitations period in instances of fraud or concealment). As such, the Trustees were not aware of the facts underlying their claim for breach of fiduciary duty by IPS (even if they *may have been* aware of the facts underlying a claim against Ark) until July 31, 2001 at the earliest, within both the three- and six-year limitations periods.

### D. Negligence and co-fiduciary liability

Because the Court herein finds that Defendants were fiduciaries and breached their fiduciary duty, and Plaintiffs filed suit within the appropriate limitations period, the Court need not address the alternative negligence claim, except to note that it carries a lower standard than the breach of fiduciary duty claim and would likely reach a similar conclusion. The Court, likewise, need not reach the co-fiduciary claim.

**IV. Conclusion**

For the reasons discussed herein, Plaintiffs' motion for summary judgment (Doc. 232) is hereby granted.  Defendants' motion for summary judgment is hereby denied (Doc. 230).  Defendant Sloan is dismissed from the case.

IT IS SO ORDERED.


    s/ *David A. Katz*    
DAVID A. KATZ
U. S. DISTRICT JUDGE